IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 5, 2013

**STATE OF TENNESSEE v. JOHN DAVIS**

**Appeal from the Criminal Court for Shelby County**
**No. 08-04153     W. Mark Ward, Judge**

_____

**No. W2012-00636-CCA-MR3-CD - Filed May 3, 2013**

_____

The Defendant-Appellant, John Davis, was convicted by a Shelby County jury of a single count of aggravated sexual battery, a Class B felony, and received a twelve-year sentence to be served at one hundred percent. On appeal, he argues that the evidence was insufficient to support the conviction and that his sentence was excessive. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Samuel L. Perkins, Memphis, Tennessee (at trial); Robert C. Brooks, Memphis, Tennessee (on appeal), for the Defendant-Appellant, John Davis.

Robert E. Cooper, Jr., Attorney General and Reporter; Kyle Hixson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Terre Fratesi, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

A Shelby County Grand Jury returned a single-count indictment charging the Defendant-Appellant, John Davis, with rape of his step-son, the victim in this case,[1] between July 1, 2006 and May 31, 2007, in violation of Tennessee Code Annotated section 39-13-522. At trial, the parties stipulated that the victim was eleven and twelve years of age at the time of the offenses.

_____

[1]It is the policy of this Court to protect the identity of victims of sexual abuse; therefore, we will refer to the victim only as "the victim" throughout this opinion.

The victim, age sixteen at trial, testified that when he was nine, his father died. At his late father's request, in November 2004, the victim and his mother moved from Georgia to Millington, Tennessee, to live with his maternal grandmother.

In Millington, the victim's mother took him to a gym near the United States Naval base, where they met Davis, who gave the victim some pointers on basketball. The victim said when Davis started dating his mother, the victim liked Davis because Davis played basketball and video games with the victim. Davis, took the victim and his mother to Jillian's restaurant in Memphis on Fridays, and he and the victim collected and traded baseball cards. The victim recounted fun trips he took with Davis and his mother to Jackson, Mississippi, Hilton Head, South Carolina, and Davis' family reunion in Pine Bluff, Arkansas. Davis picked up the victim from after school care and drove him to the gym where they would play basketball. Every Saturday, the victim and Davis got their hair cut together.

The victim said early on he liked Davis and felt they had a good relationship. He said his relationship with Davis changed when Davis married his mother, and Davis began to yell at him. The victim, his mother, and Davis lived with the victim's maternal grandmother at her house for a couple of months and then moved to a new house. After their move, the victim and Davis fought often. Davis stopped taking the victim to the gym after school and sometimes pulled the victim's mother away as soon as she returned home, keeping her from the victim. The victim said he was "mad" at his mother but "wasn't really mad at [Davis]."

The victim said "a couple of months into . . . moving to our new house, [Davis] starting touching my privates." He recalled three different times while alone with Davis, Davis "would just kind of elbow [the victim] to the back . . . and reach with the other hand" and grab and rub his genitals. The victim said Davis "squeezed really hard," and it hurt. The victim would ask what he was doing, and Davis would run downstairs. The victim did not tell his mother. One day after school, Davis asked the victim if he would like to help him clean his gun. The victim saw Davis' gun safe and commented on an SOG knife, which Davis then gave him. The victim had wanted such a knife since his friends had them, and he thought it was a very nice gift. The victim also saw Davis' two guns, both black SIG Sauers. The victim said:

> We were just talking. Then he was like I'm sorry for the way I've been being lately, you know. I've just kind of been stressed out about the new house and all. I was like okay. Well, you know, he said it won't happen again. I said well, okay. But then he pointed it to my chest and said but if you tell I'm going to kill me, my mom, and my grandma.

The victim said his mother was busy working and going to school during this time period.

-2-

The victim described fights with Davis at their new house where Davis would "punch me in my jaw and my stomach and he used to kick me in my crotch and I would just, you know, I'd fight back." He said once, Davis' push sent him "flying through the air," causing him to fall on a nail in the hallway and cut his back. When his mother inquired about the cut, the victim told her he "threw a stick up in the air and it caught [him] in the back." He said he did not tell his mother or grandmother what happened because he believed Davis would kill him and his family.

Another day after school, Davis approached the victim on the stairs in their house and told him to get on his knees. The victim said Davis "unzipped his pants and pulled out his penis" and told the victim "to suck his penis." The victim refused, slapped Davis' penis, and Davis ran downstairs because the victim's mother had returned home. The victim said another time Davis told him to get on his knees and perform oral sex, Davis forced the victim's face to Davis' penis. The victim then bit Davis' penis, and Davis "jumped back" and ran downstairs. The victim said both times Davis wore a condom. The victim had never seen a condom except for in school education movies. He described the condom as clear with a ring around it.

The victim said "whenever we got alone and [Davis] had done something previously," Davis would "say . . . if you tell anybody, I'm going to kill you, your mom, and your grandma." The victim believed Davis would carry out the threat because Davis, on another occasion, forced him to engage in fellatio at gunpoint. Davis told the victim if he bit him, Davis would shoot the victim. With the gun to his head, the victim complied. Davis was wearing a condom, and the victim did not know whether Davis ejaculated.

The victim said one night he woke up on his back and Davis was on top of him. Davis had the victim's legs up and said he was going to make the victim "his b---- right now." The victim said he had worn a new pair of pajamas his grandmother had given him and had not taken the pants off, but when he awoke, his pants were off. The victim said Davis inserted his penis in the victim, and he felt "[a] real sharp stinging pain like he was ripping into my butt." Davis walked off, and the victim went to the bathroom to "have a bowel movement." He thought there might be blood in his stool and looked but did not see any. He said "[i]t was really tender and it hurt. But when I . . . woke up the next morning, the pain was gone." He said he thought of crying out but did not because he thought he and his mother would "be alive for a couple of minutes." He explained that he wanted to wait and tell his mother when they were alone.

The victim recalled Davis moving out of the house before Christmas and returning after Christmas. After Davis left the home a second time, the victim told his mother about the abuse. He recalled one occasion when they went to take his new baby brother to the

barracks to see Davis. The victim's mother observed Davis look inside the car and "lick his lips" at the victim. The victim said he felt like Davis was "tormenting [him] for all the sexual abuse he had put [him] through," but when his mother asked him why Davis licked his lips, the victim initially lied and said that Davis was "being crazy." However, the victim said his mother was the first person he told about the sexual abuse, and she reported it. The victim met with Ms. Zurry Jones of the Child Advocacy Center (CAC) at his house and told her about the abuse. He said at that time his memory "was a whole lot clearer." He also spoke with Sergeant Vicky Malone and four prosecutors. He went to the CAC for counseling four times.

The victim said he tried to forget the abuse and move forward with his life. He did not have any feelings for Davis and denied hating or resenting him. The victim said for the past six years he never changed his story, and no one had asked him to lie.

On cross-examination, the victim was not certain whether the trips with Davis occurred before Davis married his mother. He agreed Davis and his mother met around March 2006 and married about six weeks later. The victim denied that Davis took his mother away from him and stated, "I had had enough time with my mom . . . we had a bond that was not going to be breakable." He agreed he waited until Davis moved out of the house the final time before he told his mother about the abuse. He also agreed that he was not afraid that Davis would harm them after Davis left. The victim admitted that he lied to his mother when he told her that a bruise Davis gave him on his leg came from playing football. He agreed he played basketball with Davis after dinner while the abuse was ongoing.

Although the victim was unable to confirm the exact dates of the abuse, the victim was certain that he was eleven and twelve years old when the abuse occurred. He further said that while the abuse was ongoing, he felt weak, ashamed, embarrassed, and scared. He felt he had done something wrong, and was very confused because Davis would do kind things for him during the general period of abuse. He had not told his best friend about the abuse and tried to keep his mother from discovering the abuse because he "knew if she found out, then [Davis] would . . . kill us." On re-cross examination, the victim agreed he did not want anyone to know about the abuse and lied to his mother twice.

Sergeant Vicky Malone of the Shelby County Sheriff's Office Special Victims Team was the lead investigator for the victim's case and received a referral from the Department of Children's Services (DCS) on February 20, 2008. She read the victim's statement to DCS personnel before taking her own statement from him. She identified both statements, which were admitted into evidence at trial. She did not ask the victim leading questions and declined to stress dates and times because of the traumatic nature of the offense.

Sergeant Malone said she wrote her police report March 14, 2008, and interviewed the victim alone at his mother's home April 2, 2008. In this interview, the victim said he was twelve-years-old and explained that "it started happening . . . he used to just come upstairs and touch me like my privates . . . in head lock and . . . . the elbow is in my throat like that and then I was leaning back." The victim said Davis would rub his penis "a lot."

The victim said things got worse "when [Davis] started making me put my mouth on his private" when his mother was at school. He said "the first time he did, I bit him. . . . Then the second time he came and he put like a gun to my head and he showed me that it was loaded." Davis loaded the gun in front of him and then cocked it back. The victim said Davis "would put it to my head so I wouldn't bite him. He did that a lot." The victim said Davis' penis was in his mouth "probably two minutes" and nothing came out, but Davis wore a condom each time. The victim said Davis showed him a loaded gun and threatened to shoot him, his mother, and his grandmother if he told anyone about the sexual abuse.

The victim told her that on two different occasions he thought his mother was in bed with him but realized it was Davis. The victim explained:

[Davis was] on me, like got over me and . . . he just was tormenting me and telling me what he was going to do. . . . And he did that for like a couple of minutes and then he left. And then . . . it was like a couple of weeks later he did it again. But it's like when he did it the first time, he tried to put it in my mouth. But it, again, had a condom on it because I guess he had a little white ring around it.

The victim said Davis "always tried to put it in my mouth, but I would never do it. I knew when he had the gun and when he didn't" because "[h]is pants used to sag when he had the gun." The victim said Davis told him that "he was going to make [the victim] his b----," which scared the victim.

The victim also reported that Davis hit him. Although the victim denied any bruising, he confirmed that he received a cut on his back as a result of Davis' physical abuse. Sergeant Malone notified Ben McCollom of the Navy Criminal Investigation Service (NCIS) that she was going to submit her report on the sexual assault allegations to the Grand Jury.

On cross-examination, Sgt. Malone said she interviewed Davis at the NCIS office in Millington on March 25, 2008. After she advised Davis of his rights under Miranda, Davis denied the allegations and denied touching the victim. Sergeant Malone said Davis was living in the barracks when she interviewed him. She agreed that the victim reported to DCS that the first time Davis pulled out his penis, the victim slapped it, but that the victim reported

to her that the first time Davis pulled it out, the victim bit it. She further agreed that the victim reported to her that the oral sex happened every weekend, while in other reports the victim said it happened between two and six times. Sergeant Malone denied this was inconsistent because the victim described how he was abused consistently in each statement that the victim provided. Finally, Sgt. Malone said it was "not unusual" for a child to report a different number of times that the abuse occurred.

Sergeant Malone said the victim's mother reported that Davis spent the night in the home during the time period of the alleged abuse. Her investigation did not reveal the presence of any other men in the home during the period of abuse. She said a condom was worn every time, and the victim did not report any item that could have Davis' DNA on it.

Amanda Leigh Taylor, an expert in the field of forensic sexual assault nurse examination and forensic nursing, testified that there is rarely any evidence to collect in abuse cases reported more than seventy-two hours after the offense. She examined the victim on March 31, 2008, nearly a year after the reported abuse, and compiled a report, which was admitted into evidence. Her report was consistent with the prior reports of abuse by the victim. It included a written statement by the victim and noted a May 30, 2007 offense date.

Taylor testified that it is not unusual in child abuse cases to have an approximate time period for delayed reportings. She also testified that the victim's complaint of rectal stinging and an urge for a bowel movement are consistent with rectal assault. She explained that the anus is a vascular area that heals quickly and that scarring is rarely observed. She said the victim had no recent cuts or bruises but noted the two centimeter raised scar on his upper middle back. Photographs of the victim's scar were admitted into evidence, however, Taylor could not determine the age of the scar. Taylor also found no chronic injuries to the genitalia area of the victim.

On cross-examination, Taylor agreed that the victim refused to have blood drawn. She agreed that the scar on the victim's back was consistent with a stick getting caught in his shirt and scratching his back. She agreed that she saw no injuries to the victim's oral or anal areas. On re-direct examination, Taylor said she provided Sgt. Malone with her report. She said it is not uncommon for there to be no evidence of oral assault, and that there was nothing inconsistent in the report of sexual abuse by the victim and what she found in his history and examination. On re-cross examination, Taylor said she could not date the victim's scar, and agreed "it could have come from anything." She denied that the absence of physical evidence meant that the reported events did not occur.

Following the close of the State's proof, the court denied Davis' oral motion for judgment of acquittal. The State then elected the following offense: anal penetration of the

victim in his bedroom, which caused a burning sensation in his rectal area after which he had a bowel movement and where Davis said he was going to make him his "b----."

Davis testified that he was in his sixteenth year of service in the Navy and that he did not commit the alleged crimes. He said he was working at the gym on the north side of the Millington Naval Base when he met the victim and his mother in February 2006.[2] He stated that he dated the victim's mother between two and six weeks before they were married. Davis said he lived in an apartment in Cordova, Tennessee when he dated the victim's mother and that she always came to his apartment alone. He said she never brought the victim with her and that the victim was not present for either their courtship or their wedding in Clarksville, Tennessee.

Following their marriage, Davis continued to live in his apartment until his lease expired the next month. Davis moved into the home of the victim's maternal grandmother after his lease expired. There he lived with the victim and his mother and maternal grandmother from April to July 22, 2006, and Davis described his relationship with the victim during this time as "fine." He said he and the victim played basketball or golf together and had no problems. He said he, the victim, and the victim's mother eventually moved and rented a home from the victim's maternal grandmother's boyfriend. That summer, the three of them traveled to Jackson, Mississippi, Little Rock, Arkansas, and a family reunion.

Davis said that during that summer, he worked from 7:30 a.m. to 4:00 p.m. and attended school full time at Park University, a satellite campus on the base, from 4:30 p.m. to 7:30 or 8:00 p.m. Monday through Thursday. The victim's mother would drop the victim off at the Child Development Center on the base and then go to her mother's house. Davis described the following fall as "rough and busy" because he received visitation with his daughter from a previous relationship, school resumed for him, the victim and his mother, and his son was born prematurely. His son remained in the Neonatal Intensive Care Unit until January 18, 2007, which strained his relationship with the victim's mother.

Davis said repeatedly that he was never alone with the victim. He said the victim's maternal grandmother was a good cook, so he, the victim, and his mother were often together at her house. Davis eventually filed for divorce and moved to the barracks in December 2006. He said after he moved he never had an overnight visit with the victim's mother at their house and was never alone with the victim. He said the victim's mother would set up visitation for him with their infant son at the house, and she and the victim would leave after he arrived. Davis testified that the last time he saw his son, the victim or his mother was

---

[2] Throughout his testimony at trial, Davis does not provide a year for when certain events occurred. Where a year is not provided, we glean from the context that Davis referred to the year 2006.

"November of that same year, 2006," when "[s]he came to drop off [his son] at the barracks." He then agreed with his attorney that the last time he had seen the victim and his mother was November 2007. Davis said he learned about the charges against him in March 2008, and "responded in disbelief." Asked if he had any idea why the victim would fabricate these allegations against him, Davis replied, "No, sir."

On cross-examination, Davis agreed that his short courtship of the victim's mother resulted in a "very quick marriage." He agreed that the victim's maternal grandmother and other relatives welcomed him into their family. Davis agreed that he, the victim, and the victim's mother and maternal grandmother traveled to Hilton Head together but denied taking the victim to Jillian's restaurant in Memphis. He admitted playing basketball with the victim at their house on Bethel Road but denied playing basketball with the victim at his maternal grandmother's house and denied she had a basketball goal. He denied picking the victim up from the youth center on a regular basis and said whether he picked the victim up depended "on if I had a class that day or if [the victim's mother] had class." He said he picked the victim up from the youth center "no more than two times a week." He agreed he had to sign the victim out when he picked him up. He agreed that on those days he was alone with the victim in the car. He denied coaching the victim in basketball or giving him pointers. He agreed that he and the victim collected baseball cards but denied that he took the victim to the barber shop every Saturday to get haircuts together. He said he took the victim to the barber shop on Thursdays.

Davis admitted he had guns, one SIG and one Smith and Wesson, that he kept in a gun safe at the rented house on Bethel Road. He denied that he had a military knife or that he had given one to the victim. He denied showing the victim the SIG or cleaning it in front of him. He denied talking with the victim about the SIG. Davis denied that the birth of his daughter from another woman a couple of months after his marriage to the victim's mother was "a stressor" in their marriage because he told the victim's mother about this child prior to their marriage. Davis said he believed the victim's mother prompted the victim to assert these allegations against him and believed she would try to hurt Davis. Finally, Davis denied roughhousing with the victim and did not recall the victim falling on his back on a nail.

The State recalled Sgt. Malone as a rebuttal witness. She said that when she interviewed Davis in March 2008, she asked him whether he had returned to the home on Bethel Road in an attempt to reconcile, and he told her "that he had returned to the home for a brief period of time of less than thirty days between March and April to try to reconcile his marriage." On cross-examination, Sgt. Malone agreed that Davis did not say he spent the night at the Bethel Road house during that time period, but she denied he said he went there on a daily basis.

-8-

The victim's maternal grandmother also testified as a rebuttal witness for the State. She did not recall specific dates for Davis' separation from her daughter, the victim's mother, but knew it "was during the time the baby was in the hospital." She testified that Davis returned to the Bethel Road home after the baby came home from the hospital. When she visited the Bethel Road home, she observed Davis' clothes and personal belongings. She believed that Davis had moved back into the home. She said "[i]t looked like they were trying to work things out." The last time she saw Davis at the Bethel Road home was late May 2007, at the victim's birthday party. She confirmed that Davis would take the victim to get his hair cut every Saturday morning and would take him to play basketball.

On cross-examination, the victim's maternal grandmother explained that she lived five miles away from the Bethel Road home and visited frequently during the time Davis attempted to reconcile his marriage. However, she agreed that she did not spend the night.

The jury found Davis guilty of aggravated sexual battery. At the February 17, 2012 sentencing hearing, the parties agreed that Davis was a Range I, standard offender. The State relied upon Davis' presentence report which showed that Davis had no prior criminal record and that Davis had graduated from college. In regard to his family history, the report provided that Davis had three children: two age six and one one-year-old. Davis had been previously married in 1999 and divorced in 2004. He married the victim's mother in March 2006 and divorced her in January 2009. He married his current wife in February 2010, and the report showed that his six-year-old daughter was from a relationship with a fourth woman. Davis reported working for the United States Navy since May 1996. His performance evaluations described him as an "outstanding administrator" and an "exceptional counselor and mentor."

The victim impact portion of the report was completed by the victim and his mother and provided in pertinent part the following:

The abuse of me and my family will have a lifelong impact on my life. But, I am not a victim. I am not as open when I meet new people. I am guarded and I try to protect me and my family. I listen to a persons every word to see if I can tell if they are bad and trying to hurt me. I do not trust people as much. My mom is very protective of me and my brother.

I am very protective of my family. I check the doors even during the day. I have tried to protect my family. I feel that John D. Davis will try to hurt us even if he is in jail. John D. Davis is a predator and a monster. I am scared he will come around or come to my school. I completely forgot my 11th and 12th birthday. I will never get that back.

-9-

. . . .

As for me and my family, my little brother suffers from Cerebral Palsy because of the abuse of my mother by [Davis] while she was pregnant. I am forever changed, I was just a kid. . . . I did all I could to protect my mom from Evil John Davis. I am ready to move on with my life. I do have trouble sleeping. I get up in the middle of the night and check on my family. I'm constantly checking doors.

. . . .

We will need a lifetime protective order for me and my family, including my grandmother. We need to know when he is released and if he is anywhere near us.

The victim's mother wrote in pertinent part:

[Davis] is a true predator, and preys on women and children. John Davis always marries women with children, (boys ages 9-12) and he marries fast. This way he can have access to children through the moms. When he molest[s] the children it is important that he gets the mom or partner pregnant.

Eleven letters from people who knew Davis in his various roles in the community were attached to the presentence report. The letters were generally complimentary of Davis and attested to his good character. The court also considered the testimony of three of Davis' fraternity brothers, who met him after the instant offense occurred. Each witness testified that they would allow Davis to be around their children and believed that Davis was innocent. Davis' mother, sister, and wife also testified that the instant conviction did not fit his character, and they did not expect a recurrence.

After considering the above proof, the trial court imposed a sentence of twelve years imprisonment. Davis subsequently filed a motion for new trial March 23, 2012, and the trial court denied it as late filed. We granted Davis' motion to waive the timely filing of his notice of appeal, and this appeal is now properly before this court.

**ANALYSIS**

**I. Sufficiency of the Evidence.** Davis asserts the evidence was insufficient to support his conviction because the State did not allege a definite offense date and failed to corroborate the victim's testimony. The State responds that "[t]he law does not support the defendant's arguments, and the verdict of the jury should be affirmed." We agree with the State.

-10-

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

"In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958)). However, "[t]he jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable, 313 S.W.2d at 457). This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Sisk, 343 S.W.3d 60, 65 (Tenn. 2011) (citing State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010)). We note that the standard of review "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Hanson, 279 S.W.3d 265, 275 (quoting State v. Sutton, 166 S.W.3d 686, 689 (Tenn. 2005)); State v. Carruthers, 35 S.W.3d 516, 557 (Tenn. 2000). The court in Dorantes specifically adopted the standard for circumstantial evidence established by the United States Supreme Court in Holland:

"Circumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more."

Dorantes, 331 S.W.3d at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)).

Davis was convicted of aggravated sexual battery, which is defined as "unlawful sexual contact . . . when the victim is less than thirteen (13) years of age." T.C.A. § 39-13-504(a)(4)(2006). "'Sexual contact' includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Id. § 39-13-501(6)(2006). "'Intimate parts' includes the primary genital area, groin, inner thigh, buttock or breast of a human being." Id. § 39-13-501(2).

As an initial matter, the parties stipulated that the victim was eleven and twelve at the time of the offenses. Davis challenges the sufficiency of the evidence claiming that the jury failed to corroborate the testimony of the victim. Here, the victim specifically testified at trial that he awoke in his bed one night on his back with Davis on top of him pulling his legs up and penetrating his anus with Davis' penis while saying he was going to make the victim his "b----." This testimony, which the jury accredited, more than satisfied the elements of aggravated sexual battery. Moreover, this court has previously held that "there is no requirement that the victim's testimony be corroborated." State v. Smith, 42 S.W.3d 101, 106 (Tenn. Crim. App. 2000) (affirming convictions of aggravated sexual battery and assault). Davis is not entitled to relief on this issue.

Davis further asserts that the evidence is insufficient to support the verdict because "no date whatsoever was established by the State's proof." The Tennessee Supreme Court rejected the same argument in State v. Shelton, 851 S.W.2d 134, 137 (Tenn. 1993). In Shelton, the Court stated:

By insisting upon election, we emphasize that the state is not required to identify the particular date of the chosen offense. The time of an offense is often immaterial in the bringing of an indictment. Moreover, such a

requirement would make impossible the prosecution of criminal acts committed against young children who are the frequent victims of cognate crimes and crimes involving the age of consent. However, a particular offense can often be identified without a date.

Id. (internal citation omitted). Because the State made a proper election in this case, it was not required to identify a specific offense date. Accordingly, Davis is not entitled to relief.

**II. Excessive Sentence.** Davis argues his sentence is "manifestly excessive" due to application of certain enhancement factors and failure to apply certain mitigation factors. The State responds that the trial court followed the purposes and principles of the Tennessee sentencing act and therefore did not err in imposing the twelve-year sentence in this case. We agree with the State.

Because of the broad discretion given to trial courts by the 2005 amendments to the sentencing act, "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012). Moreover, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Id. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Id. Therefore, this court reviews a trial court's sentencing determinations under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

When determining a sentence, a trial court is required to consider: (1) the evidence at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the applicable mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. T.C.A. § 40-35-401 (2010), Sentencing Comm'n Cmts.; State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

-13-

At sentencing, the parties agreed that Davis was a Range I, standard offender and therefore subject to a sentence range of eight to twelve years. The trial court imposed a sentence of twelve years, which is within the applicable sentencing range. Our review of the record shows that the trial court considered the purposes and principles of the Sentencing Act and the applicable mitigating and enhancement factors. Thus, his sentence is presumed reasonable and will not be disturbed absent an abuse of discretion.

In sentencing Davis to twelve years imprisonment, the trial court applied the following enhancement factors: (1) that Davis had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; namely, prior acts of physical abuse and rape of the victim; (2) that Davis treated or allowed the victim to be treated with exceptional cruelty during the commission of the offense based on his use of a handgun and threats to kill the victim and his family; (3) that Davis possessed or employed a firearm during the commission of the offense; and (4) that Davis abused a position of private trust in a manner that significantly facilitated the commission or the fulfillment of the offense. See T.C.A. § 40-35-114(1), (5), (9), (14) (2012). The trial court also acknowledged Davis' military service career, good work ethic, and recent work in the community. It additionally recognized that Davis had no prior criminal convictions and was a good husband to his current wife.

The trial court provided a detailed review of the facts and circumstances at sentencing and stated, in pertinent part, the following:

> The overwhelming thing that strikes me in this case is that this defendant, by a preponderance of the evidence, I find that this defendant committed a rape of child, which carries fifteen to twenty five years. He should be before me right now and we should be arguing about a sentence of fifteen to twenty five years. That is what I find by a preponderance of the evidence in this case.
>
> I believe based on the evidence that I heard that he forced this young man to perform sex. That he penetrated this young man, orally. I also think that he penetrated this young man, by a preponderance of the evidence in his anus.
>
> . . . .
>
> I think under those circumstances the maximum sentence of twelve years would be appropriate if there was no enhancement in this case.

-14-

In challenging his sentence, Davis specifically argues that there was insufficient proof to support application of factors (1), (5), and (14), that Davis had a previous history of criminal behavior in addition to those necessary to establish the appropriate range, that Davis treated or allowed the victim to be treated with exceptional cruelty, and that Davis abused a position of private trust to facilitate the offense. Davis also argues that the trial court failed to consider his military, familial, and community support.[3] In support of these issues, Davis disputes the testimony of the victim and insists "[j]ust because the jury did not believe what [Davis] said, does not mean that it was a lie." In response, the State argues, and we agree, that "[a] court may apply an enhancement factor based on facts underlying an offense for which the defendant has been acquitted, so long as the facts are established in the record by a preponderance of the evidence." State v. Winfield, 23 S.W.3d 279, 281 (Tenn. 2000); see also State v. Carico, 968 S.W.2d 280, 287-88 (Tenn. 1998) (holding that evidence of criminal acts other than the acts on which the conviction is based that were committed against the victim can be used during sentencing).

Based on the proof adduced at trial, the trial court explicitly found, by a preponderance of the evidence, that Davis anally penetrated the victim, forced the victim to perform oral sex, and treated the victim with exceptional cruelty by threatening to kill the victim and his family if the victim disclosed the abuse. The trial court also properly determined that Davis abused his position as the victim's step-father. The proof clearly demonstrated that Davis utilized his position as the step-father of the victim to perpetrate the abuse. Finally, at the conclusion of its sentencing determination, the trial court stated "even if there were no enhancement factors I would give [Davis] the twelve years."

Because the record shows that the trial court carefully considered the evidence, the enhancement and mitigating factors, and the purposes and principles of sentencing prior to imposing the sentence in this case, Davis has failed to either establish an abuse of discretion or otherwise overcome the presumption of reasonableness afforded sentences which reflect a proper application of the purposes and principles of our statutory scheme. We conclude that the trial court properly imposed the twelve-year sentence, and Davis is not entitled to relief.

## CONCLUSION

---

[3]Davis argued in his brief that the trial court improperly relied upon enhancement factors (6) and (7), that the personal injuries inflicted upon, or the amount of damage to property, sustained by or taken from the victim was particularly great and that the offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement. T.C.A. § 40-35-114(6), (7). However, the record clearly reflects that the trial court declined to apply these factors to Davis' sentence.

Upon a thorough review of the record and appropriate authority, we affirm the judgment and sentence of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE